**PUROFIED DOWN PRODUCTS CORP.,**
Plaintiff-Appellee,

v.

**TRAVELERS FIRE INSURANCE COM-
PANY, Defendant-Appellant.**

No. 77, Docket 25748.

United States Court of Appeals
Second Circuit.

Argued Nov. 13, 1959.

Decided May 4, 1960.

Rehearing in banc Denied
June 2, 1960.

Lumbard, Chief Judge, dissented.

Norman D. Levy, New York City (Irving L. Spanier, New York City, on the brief), for plaintiff-appellee.

Vincent L. Leibell, Jr., New York City (Bigham, Englar, Jones & Houston, New York City, on the brief), for defendant-appellant.

Before SWAN, MAGRUDER and LUMBARD, Circuit Judges.

MAGRUDER, Circuit Judge.

An insurance company takes this appeal from a judgment by the district court in favor of the insured, in the sum of $8,418.37, on a marine insurance policy. We have determined that we should affirm the judgment under review, with a slight modification, 172 F.Supp. 472.

The insured, Purofied Down Products Corporation, hereinafter called "Purofied," is engaged in the business of importing feathers and processing them for use in the manufacture of pillows, comforters and sleeping bags. In November, 1949, the Travelers Fire Insurance Company, hereinafter called "Travelers," issued to Purofied an open or floating marine insurance policy. This contract was "valued"; that is, the parties stipulated in advance the amount to be paid the insured in the event of total loss. Because the insured could not know at the time it took out the policy the exact value of the subsequent shipments to be covered thereunder, the parties agreed upon a basis of value, rather than upon a specific figure:

> "7. Valued premium included, at amount of invoice including all charges therein, plus any prepaid and/or advanced and/or guaranteed freight not included in the invoice, plus 10%, foreign currency to be converted into dollars at bankers' sight rate of exchange applicable to each invoice and/or credit and/or draft."

The policy contained other provisions relevant to the issues in this case:

"19. This insurance shall not be vitiated by any unintentional error in description of vessel, voyage or interest, but any such error must be reported to this Company as soon as known to the Assured, and addition-al premium paid if required."

"26. (A) It is a condition of the liability of this Company that all risks hereunder be reported as soon as known to the Assured and amounts declared as soon as ascertained; and should the Assured fail to report risks covered hereby, then this policy as to all subsequent risks, shall become null and void if this Company shall so elect;

(B) The Company is entitled to premiums, at rates of this Company, on all risks covered herein whether reported or not;

(C) This Company shall have the privilege, at any time during business hours, to inspect the records of the Assured as respects shipments coming within the terms of this Policy."

"27. It is a condition of this Policy, and it is hereby agreed, that the Assured's brokers, Buhler Service Corp. * * * shall be deemed to be exclusively the agents of the Assured and not of this Company in any and all matters relating to * * * this insurance. Any notice given or mailed by or on behalf of this Company to the said brokers * * * shall be deemed to have been delivered to the Assured."

Also, by endorsement in 1952, a term was added to the contract in the nature of a limitation, as follows:

"No suit or action for recovery of any claim arising under this Policy shall be sustainable in any court unless such suit or action shall have been commenced within 12 months next after notice to the consignee of the arrival of the shipment."

A schedule attached to the policy established premiums at a certain rate per $100.00 of insurance.

A shipment of feathers consigned to the insured was totally lost on July 18, 1952, while at sea aboard the M/S Black Gull. Prior to this date the insured had sent to the underwriter a provisional declaration covering the estimated value of the shipment, which was stated to be $52,000. Subsequent to the loss, and after both parties were aware of the same, the insured sent to the underwriter a final declaration, again giving the value of the shipment as $52,000. In this respect the insured was merely following a "customary procedure" which it had indulged in throughout the life of the policy: in declaring the amount of each risk or shipment to which coverage attached, it reported only the invoice amount of the shipment and omitted the appropriate freight charges plus the extra ten per cent. Since the insurer determined the amount of the premium upon the basis of the final declaration, which seems to be the declaration required by clause 26(A), the premiums billed by the insurer and paid by the insured during the life of the policy were lower than they should have been.

 The evidence does not show and the trial court made no findings as to whether or not the undervalued declarations were the product of bad faith on the part of the insured or whether or not the insurer at the time it issued its check for $52,000 was cognizant of the insured's "customary procedure." It may well be that Travelers had the right to consider the policy void and refuse to recognize Purofied's claim *in toto.* Cf. *Atlantic Fruit Co. v. Hamilton Fire Insurance Co. of New York,* 1929, 251 N.Y. 98, 167 N.E. 184.[1] But even if Travelers

---

3. We read Wilburn Boat Co. v. Fireman's Fund Insurance Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, to require us to apply state law in the area of marine insurance unless there is a well-established federal admiralty rule which gov-

did not know, when it paid the $52,000, that Purofied's declarations had always been undervalued, the receipt of such knowledge assuredly preceded the initiation of this action. Travelers having up to now made no claim of forfeiture, it must be deemed to have waived whatever option it conceivably may once have had. See Brink v. Hanover Fire Insurance Co., 1880, 80 N.Y. 108; Fuessler v. Chautauqua County Patrons' Fire Relief Ass'n, 1940, 260 App.Div. 991, 23 N.Y.S. 2d 288; Lieberman v. Equitable Life Assurance Society, 1938, 168 Misc. 259, 5 N.Y.S.2d 777.

Purofied claims that under clause 7 of the policy it was entitled to recover from the insurer the amount of $52,000, as stated in its final declaration, and prepaid freight in the amount of $680.63, plus an additional ten per cent, or a total of $52,000 plus $5,945.69, with interest. Travelers contends that Purofied is bound by the figure stated in its final declaration. We think the issue is governed by St. Paul Fire & Marine Insurance Co. v. Pure Oil Co., 2 Cir., 1933, 63 F.2d 771. There the insurer issued certificates of insurance to the insured under a floating marine policy at a time when both parties knew that the goods to which the certificates applied had been lost. These certificates of insurance are the counterparts of the declaration involved in the present litigation, being equivalent to the insurer's receipt of the insured's declaration. See Thayer, "Marine Insurance Certificates," 49 Harv.L. Rev. 239 (1935). In the St. Paul Fire & Marine Insurance Co. case, the certificates stipulated that the oil lost was to be valued at $2.75 a barrel. The policy itself valued each risk at the sales price

of the goods at the port of destination on the date of sailing. After paying the insured $2.75 per barrel, a figure which both parties calculated to be the sales price at port of destination on day of sailing, the insurer discovered that $2.19 was the correct price and sued to recover the excess from the insured. The court held that the certificates of insurance did not create a new valuation, for they were issued after knowledge of the loss had reached both parties. Had these certificates been issued prior to the loss, they perhaps would have bound both insured and insurer. Because they were issued after notice of loss, however, they could only constitute an accord which later payment might satisfy.

■ Such a result is sound. The purpose of a binding declaration of value being to stipulate damages in advance, once the risk has been lost the damages are suffered, and the insurer is in debt to the insured. After notice of loss, a stipulation of the damages owing can be binding, if at all, only as an agreement to discharge the outstanding debt by payment of the sum agreed upon. In other words, if the parties so intend, a declaration of value by the insured and acceptance by the insurer following the loss of the risk may be an accord later to be satisfied by payment of the stipulated figure. Taken solely as a declaration of value, Purofied's report is not binding.[2]

■ Notwithstanding the existence of dispute as to the amount due for the loss aboard the Black Gull, Travelers mailed to Buhler Service Corporation, which acted only as insured's agent and broker in the transaction, a check for $52,000, payable to Purofied. There was no statement by the insurer that this

---

erns the particular problem before the court. Pursuant to Auten v. Auten, 1954, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246, we have looked to New York law in those instances where entrenched federal precedent is lacking.

2. Forster v. Insurance Company of North America, 2 Cir., 1944, 139 F.2d 875, is inapplicable. Under the policy there in controversy, coverage attended upon declaration of the risk; insurance could not

attach until the insured's declaration was made. Consequently each declaration, its acceptance, and the passage of a premium payment, constituted a separate contract binding upon the parties. Such, of course, is not the case here. Moreover, the declarations to which the insured was held bound in the Forster case preceded termination of the risk. Those declarations which followed termination of the risk were given no effect.

check was tendered as "full and final payment" on the policy; nor was there any covering letter to that effect accompanying the check. Under date of August 28, 1952, Buhler Service Corp. forwarded this check to Purofied, with a letter stating that:

"We take pleasure in delivering to you draft of the Travelers Insurance Company in the amount of $52,000. in full and final payment of your Ocean Marine loss which occurred on July 18th, 1952 on the S.S. Black Gull. In that connection, we call your attention to the fact that the declaration you filed with the Insurance Carrier indicated that the full valuation was $52,000. The latter amount was, therefore, the maximum amount of coverage you purchased."

The above was the language of Purofied's agent, not that of Travelers, as was emphasized in clause 27 of the policy, quoted above. The letter of August 28, 1952, may have indicated the subjective opinion of the insured's agent, but assuredly evinces no agreement between insured and insurer that the receipt of the check was to discharge the insurer's liability under the policy. Nor did Purofied defraud Travelers by depositing the check, for Travelers imposed no condition on its use. Under such circumstances, an accord and satisfaction has not been reached. Hudson v. Yonkers Fruit Co., Inc., 1932, 258 N.Y. 168, 179 N.E. 373, 80 A.L.R. 1052.

For present purposes we shall assume that the limitation endorsed on the policy in 1952 added a term to the insurance contract which became binding upon the insured, though this, incidentally, is contested by Purofied. Further we shall assume that an underwriter by a clearly expressed provision of the contract may shorten the statutory period of limitations. Still, in our opinion, appellant is mistaken in relying upon the following provision to defeat the policy:

"No suit or action for recovery of any claim arising under this Policy shall be sustainable in any court unless such suit or action shall have been commenced within 12 months next after notice to the consignee of the arrival of the shipment."

Apparently the usual procedure regarding notice of arrival of marine cargo is for the carrier to send out the arrival notice after the goods have arrived at the pier. See Sauerbrier, Marine Cargo Operations 11 (1956). Indeed, in the present case the notice received by Purofied consisted of the usual notice of arrival form which was generally sent out after the goods had arrived. But the particular form sent to Purofied contained the superimposed words "Expected Arrival." Obviously, when this notice was sent to the consignee the goods had not actually arrived, and because they were totally lost at sea they never arrived. In view of the settled rule of construction that the wording of insurance policies must be taken strictly against the insurer, Greaves v. Public Service Mutual Insurance Co., 1959, 5 N.Y.2d 120, 181 N.Y.S. 2d 489, 155 N.E.2d 390, we should not say that the receipt by the consignee of the notice of "expected arrival" means the same thing as a "notice of arrival," as that phrase is used in the policy. As the trial court observed, had Travelers wished to limit the time for legal action where a total loss was incurred and where by hypothesis no notice of arrival could be received, it could have done so in specific terms.

There are two additional arguments made by appellant which were not presented to the district court.

It is contended by Travelers that the insured must show that the lost cargo was in good condition when it was placed on board the Black Gull. Concededly, a clean bill of lading was given to the insured, but this, the insurer contends, is insufficient to show good condition, which in turn, Travelers says, is a prerequisite to recovery. As a matter of fact, the entire purpose of a valued policy, or of providing in a policy the basis of value, as in the instant case, is to preclude the necessity of having the insured make

such a showing as Travelers insists Purofied must make concerning the good condition of the cargo at the time of shipment. The basis of value, agreed to by the parties at the inception of the policy, is binding. See Gulf Refining Co. v. Atlantic Mutual Insurance Co., 1929, 279 U.S. 708, 710–711, 49 S.Ct. 439, 73 L.Ed. 914; Aetna Insurance Co. v. United Fruit Co., 1938, 304 U.S. 430, 434, 58 S.Ct. 959, 82 L.Ed. 1443; New York & Cuba Mail S. S. Co. v. Royal Exchange Assurance, 2 Cir., 1907, 154 F. 315, 316–317.

■ Travelers also contends, for the first time in this court, that if we should affirm the judgment for the plaintiff we should at least make a deduction covering the back premiums which the insured should have paid during the life of the policy. In fact the attorney for Purofied

acknowledged that $1,638.59 in back premiums was due. On the other hand, Travelers did not assert any counterclaim for back premiums, nor were back premiums mentioned in the answer by way of any possible set-off. The issue was simply not raised by the pleadings. Nonetheless, we think that the admission by appellee's attorney that back premiums were due and owing constitutes a trial of the issue with appellee's implicit consent.[3] Even though the appellate level has been reached, pleadings may be deemed amended to conform to the issues tried below. Federal Rules of Civil Procedure, Rule 15(b), 28 U.S. C.A.; Val Marine Corp. v. Costas, 2 Cir., 1958, 256 F.2d 911; Shelley v. Union Oil Co. of California, 9 Cir., 1953, 203 F.2d 808; Balabanoff v. Kellogg, 9 Cir., 1941, 118 F.2d 597. Accordingly,

3. The admission was made in the following context (Mr. Leibell is counsel for appellant; Mr. Levy is counsel for, and the witness is an officer of, appellee):

"By Mr. Leibell:

"Q. I ask you if you can identify the following papers. A. Yes.

"Q. Is that a declaration made by the plaintiff corporation under the policy? A. Yes.

"Mr. Leibell: I ask that it be marked for identification.

"(Marked Defendant's Exhibit D for identification.)

"Mr. Leibell: I offer in evidence, your Honor.

"Mr. Levy: If this is being offered for the purpose of indicating that there has been no freight paid or declared, it is conceded that the defendant has not declared freight on the few shipments—

"The Court: Is this on some prior shipment?

"Mr. Leibell: As on a prior shipment, your Honor.

"The Court: Why do we have to get into that?

"Mr. Leibell: They offered some evidence, put in a letter about additional premiums not paid, which, of course, is true enough here; there were additional premiums they never paid, and I am showing, by offering this declaration under the policy, that in connection with a prior shipment where concededly now there was $21,526.54 worth of freight, that that freight was never declared and no premium ever paid upon it, and, in

fact, the amount declared was, according to the schedule attached to the letter signed by Mr. Puro—the amount given was the invoice value, and the insurance company never knew, never received any premium on that freight, and it ties in with my question to Mr. Puro as to how would the insurance company know the amount of freight involved unless it was declared by the assured.

"The Court: Any objection?

"Mr. Levy: Yes, I object, if your Honor please. The question as to whether or not freight was declared is not relevant on prior shipments to this inquiry.

"It is conceded that there were no declarations which included freight on the few shipments on which freight was to be declared.

"The Court: Isn't that enough, then?

"Mr. Leibell: If it is also conceded that at the time the claim was made and a check for $52,000 was received it is also conceded that the plaintiff did owe the defendant for some particular sum, for some sum not identified, for premiums never paid in the past.

"The Court: Will that be conceded? There was some inquiry by the plaintiff about it, I believe, under that letter.

"Mr. Levy: It is conceded that there are additional premiums due for freight that has not been declared, such premiums totaling $1,638.59.

"Mr. Leibell: Did you get that figure from the letter of September 17, 1952, from Buhler which was marked as Plaintiff's Exhibit 7 which you put in evidence?

"Mr. Levy: Yes."

the judgment for Purofied must be modified by crediting Travelers with the $1,638.59 concededly due from Purofied in the form of back premiums.

A judgment will be entered modifying the judgment of the District Court in accordance with the foregoing opinion, and as so modified affirming the same.

LUMBARD, Chief Judge (dissenting).

The majority, in holding that no record and satisfaction has been proved by the defendant, apparently decides that only when payment is accompanied by a written statement that it is in full satisfaction of the disputed sum may the court find such an agreement to compromise. I think that the majority view of the question is unsound. Whether an accord and satisfaction has been made out depends upon the intention of the parties, and not upon any particular manner of manifestation of their intent.

The historical facts of this case are scarcely in dispute; only the factual inference of the parties' intention to be drawn from this evidence is disputed. I think that the one reasonable inference that can be drawn from examination of this evidence is that the parties believed the check for $52,000 to be in full settlement of the plaintiff's claim. At the time it received the check plaintiff had demanded payment of a sum more than $5000 in excess of the amount of the check, and the defendant, to the knowledge of the plaintiff, had rejected this demand. The negotiations with the defendant for settlement of the claim had been carried on entirely through the plaintiff's insurance broker. Though neither party submitted evidence as to what was said during the course of these negotiations, the broker's view of the understanding ultimately reached is plain from the letter which he sent to the plaintiff accompanying the check. In it the broker states that the check is in "full and final payment" of the defendant's liability. Undoubtedly, the broker thereby expressed his understanding of the outcome of his oral negotiations with the defendant. Certainly, the mere fact that defendant failed to include a covering letter with the check does not warrant the conclusion that it viewed the matter differently than the plaintiff's broker. Having already orally made its position sufficiently clear that the broker understood the check to be full payment of the claim, the defendant was not required to reiterate this fact in writing when the check was mailed. That plaintiff well understood that the check was intended to constitute an accord and satisfaction is apparent not only from the broker's letter, but from the fact that plaintiff hesitated for three weeks before depositing the check in its bank account. The only explanation for this delay, particularly in view of testimony at trial that plaintiff was short of cash at the time, is that it recognized the legal significance of depositing the check.

Considering all the circumstances of the case, I think that it was clearly erroneous for the court to hold that an accord and satisfaction had not been proved. I would therefore reverse and direct judgment for the defendant.